I,GASKINS, J.
Following a jury trial, the defendant, Fred Howard, Jr., was convicted of unauthorized use of a motor vehicle, aggravated flight from an officer, and aggravated criminal damage to property. Thereafter, he was adjudicated a fourth felony offender, and, as to the aggravated criminal damage to property conviction, he was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. On the aggravated flight from an officer conviction, the defendant was sentenced to two years at hard labor. On the conviction of unauthorized use of a motor vehicle, the defendant was sentenced to five years at hard labor. The sentences were ordered to run concurrent with each other. The defendant appeals. We affirm the defendant’s convictions and sentences.
FACTS
The defendant was originally charged by bill of information with aggravated flight from an officer, La. R.S. 14:108.1(C); unauthorized use of a motor vehicle, La. R.S. 14:68.4; and aggravated criminal damage to property, La. R.S. 14:55. The charges stem from a 2000 incident involving a 1989 Dodge van owned by Stephen Taylor. On October 2, 2000, the defendant — who identified himself as Fred White — approached *938 Taylor at his home, offering to detail the van. Taylor agreed and allowed the defendant to take the van to a ear wash twice. The second time, the defendant did not return the van at the agreed-upon time. On October 6, 2000, Taylor reported the van stolen.
On October 10, 2000, a Shreveport motorcycle officer spotted the defendant driving the van and attempted to stop him. The defendant refused |%to pull over and attempted to flee. A high speed chase ensued with several patrol units in pursuit. The defendant engaged in numerous highly dangerous driving maneuvers which endangered not only himself and the pursuing officers, but also the motoring public. During his lengthy flight from the officers, he traveled on the interstate and through residential neighborhoods. At one point, the defendant crossed over an interstate median and began going the wrong way on Hwy. 3132. He also left the interstate by driving the wrong direction on an entrance ramp. The defendant was traveling at speeds up to 80 miles per hour.
On the Cross Lake bridge, several of the officers began a maneuver to stop the van by boxing it in. Sergeant Joey Hester positioned his patrol unit ahead of the van, while other officers followed behind it. Sergeant Hester began slowing his patrol car down at the same time the van was alongside an 18-wheeler, effectively putting the defendant’s van in a three-sided box. As the vehicles slowed down and the defendant maneuvered to get around the lead patrol car, the defendant’s van “rammed” or bumped into the rear of Hester’s vehicle an estimated four to eight times. The vehicles were still traveling at a high rate of speed. The entire chase and the bumping incident were videotaped by cameras in the patrol cars.
At some point during the pursuit, officers tried to shoot out the van’s tires. Near the conclusion of the chase, shots were also fired by an officer who had to jump out of the van’s path. Shortly thereafter, the van.' — which ended up with two flat tires — finally stopped. It was then discovered that the defendant had sustained gunshot injuries to the eye and arm.
|3The defendant was arrested and taken to LSU Medical Center for treatment. While there, the defendant was read his Miranda rights, signed a rights waiver form, and gave a voluntary statement about the incident. The defendant gave several reasons for not returning the van and for not stopping. The primary reason was that he knew he had an outstanding warrant, and he did not want to spend the holidays in jail.
Prior to trial, the state gave a La. C.E. art. 404(B) notice of its intention to adduce evidence at trial of prior similar acts by the defendant in not returning other vehicles taken for detailing. At the Prieur hearing on the motion, testimony on the following incidents was adduced.
Stephen Taylor, the victim in the instant case, testified that on October 2, 2000, he agreed to let the defendant take his 1989 Dodge van for “detailing.” When it was returned that night, the carpet was still wet and the top had not been cleaned; the defendant offered to take it again for further cleaning. The defendant left a Mercury Grand Marquis; it was later determined that this car had been stolen in Marshall, Texas. The van was not returned and Taylor reported it stolen on October 6, 2000. The next time he saw his van was on October 10, 2000, when it was involved in a high speed chase with the police.
The evidence at the Prieur hearing also showed that in the fall of 1997, Jerome Holland hired the defendant to hand wax his 1978 Oldsmobile. After the defendant *939 indicated that he knew a potential buyer, Holland allowed the defendant to take the car to an aunt for possible purchase. After several attempts to get either the car or the money, Holland | ¿reported the car stolen. About a month later, the police recovered the car. The interior, which had been in mint condition, had been damaged by cigarette burns. The defendant, who was driving the car when the police located it, was arrested and charged with unauthorized use of a motor vehicle.. Holland further testified that the case went to trial, and the defendant was acquitted.
Tommy Lemons testified that in November 1999, he allowed the defendant to take his Buick LeSabre for detailing. Lemons testified that the vehicle was never returned, and he notified the police. Several months later, the vehicle was recovered by the police after it was involved in a hit- and-run accident on March 6, 2000.
According to the evidence, on March 10, 2000, James Bush allowed the defendant to take his 1996 Toyota Camry to be cleaned and returned the same day. The car was not returned, and Bush reported it stolen on March 11, 2000. It was returned on March 12, 2000, with no explanation for the delay. Bush testified that the doors and the moon roof were scratched up, and there were items left in the ear that did not belong to the owner. These items included CD’s, women’s shoes, and a piece of a glass container which the police identified as part of a broken crack vial.
Mary Daisy Cole testified that in January 2000, she let the defendant take her Buick LeSabre for cleaning, to be returned that evening. The vehicle was not returned, and several days later the Shreveport Police called her to pick up the vehicle. It had been found abandoned and damaged. According to Mrs. Cole, the car was filthy. The steering wheel was |Rdamaged, windows were broken out, and there were' clothing items in the car that did not belong to the owners.
Scott Quigley testified that on the morning of July 7, 2000, the defendant took his 1999 Porsche Boxster for detailing and told him it would be back by noon the same day. Quigley further testified that the car was not returned on time, and later that day, it was reported to have been involved in a hit-and-run accident. Quig-ley testified that the car was not returned until about 8:00 p.m. with body damage. When Quigley confronted the defendant about the damage, he denied that he did anything to the car and left immediately.
Several police officers also testified as to the police involvement on theses incidents. The trial court found that the above incidents would be admissible at the defendant’s trial. The defendant’s objection was noted.
Although the defendant’s trial counsel did not file a motion to suppress his confession, a stipulation was entered just prior to trial that during the state’s case, the tape of the confession would not be played in order to avoid references to the defendant’s prior convictions. The parties further stipulated that if the defendant testified, the tape could then be used by the state in its rebuttal.
At trial, Holland, Lemons, Bush, Cole and Quigley testified as to the earlier “other crimes.” All of these witnesses identified the defendant as the person who took their vehicles. Then Taylor testified about the defendant taking his van for detailing and failing to return it. Taylor also testified that on October 10, 2000, he was at an ATM machine, turned around and saw Ifihis van being pursued down the street by the police. Taylor identified the defendant as the person who took his van, and testified that he did not give the defendant the authority to keep the vehicle.
*940 Police officers testified about the attempts to stop the van driven by the defendant. Several of the patrol cars had video recorders, and tapes of the pursuit were admitted into evidence. Officer Michael Harvey and Sergeant Hester testified about the defendant “ramming” the van into the back of Hester’s patrol car at least four times; according to Hester, the vehicles were traveling at approximately 50 to 60 mph on the Cross Lake bridge at the time of these contacts.
After the state rested, the defendant chose to testify against his counsel’s advice. During his rambling testimony, he provided several reasons for not returning the vehicle and for not stopping for the police. The defendant testified that the contact between the van and the patrol car was caused by the actions of the patrol car.
After the defendant testified, the defendant insisted that his counsel put on evidence that Sergeant Hester and another officer had received departmental reprimands and suspensions for their actions during the chase. Defense counsel stated on the record that she had advised the defendant against this course of action because she believed that it would be ultimately to his detriment; however, the defendant chose to disregard her advice. Defense counsel then called Sergeant Hester to the stand.[1] He testified that he received a letter of reprimand and a five-day fine for insubordination and |7careless operation. The basis of the insubordination charge was his failure to stop the pursuit when a supervisor instructed him to do so; however, Sergeant Hester testified that there were several supervisors involved in the chase and that they gave conflicting instructions on whether to continue the pursuit. The reckless operation charge was based on the potential danger to which Sergeant Hester exposed himself during the blocking maneuver while the van was alongside the 18-wheeler on a bridge.
On rebuttal, the state presented the testimony of the officer who took the defendant’s statement. The tape of the statement was played for the jury.
The jury unanimously found the defendant guilty as charged of unauthorized use of a motor vehicle, aggravated flight from an officer, and aggravated criminal damage to property. The defendant’s motion for new trial and motion for post verdict judgment of acquittal were denied.
The state filed a habitual offender bill of information, alleging that with the present conviction for aggravated criminal damage to property, the defendant was a fourth felony offender.
The defendant did not file objections to the habitual offender bill of information. At the hearing on the habitual offender bill of information, the defendant did not object to the state’s introduction of the bills of information and minutes of the prior convictions. They included a 1987 conviction for indecent behavior with a juvenile, a 1991 conviction for unauthorized use of a movable, and a 1991 conviction for attempted sexual Isbattery. A fingerprint expert identified the fingerprints on bills of information as those of the defendant.
The defendant was adjudicated a fourth felony offender. Accordingly, he was sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence on the aggravated criminal damage to property conviction. On the conviction of aggravated flight from an officer, he was sentenced to two years at hard labor. On the unauthorized use of a motor vehicle conviction, the defendant was sentenced to five years at hard labor. The *941 sentences were ordered to run concurrent with each other. The defendant did not file a motion to reconsider the sentences.
The defendant timely appealed.
The Louisiana Appellate Project enrolled to represent the defendant, who had been represented at trial by the Indigent Defender Office. Appellate counsel filed a brief in which he argued excessive sentence, contending that although the habitual offender sentence in effect at the date of the offense was mandatory life imprisonment, the trial court should have considered the factors in State v. Dorthey, 623 So.2d 1276 (La.1993), and State v. Clark, 391 So.2d 1174 (La.1980). He also filed a Benjamin/ Anders motion in which he asserted that there were no nonfrivolous assignments of error and asked to be allowed to withdraw as counsel of record.
This court denied appellate counsel’s motion, holding that the procedure to withdraw was not available to counsel who briefed an assignment of error, then sought to withdraw. This court further ordered the |flappellate counsel to review the record and file fully briefed assignments of error. The state was given the opportunity to file a reply brief. The defendant’s counsel filed a new brief, asserting two assignments of error.
The defendant filed a pro se motion to check out the record and file a supplemental brief, which was granted. However, no pro se brief was filed by the defendant.
OTHER CRIMES EVIDENCE
In his first assignment of error, the defendant argues that the trial court erred in allowing “other crimes” evidence of other incidents involving the defendant not returning automobiles taken for cleaning. The record shows that before trial, a Pri-eur hearing was held on this other crimes evidence. The present victim, Taylor, and six other witnesses testified about the defendant taking a vehicle for cleaning, and then not returning it. The trial court ruled that this evidence was admissible as “other crimes” evidence, pursuant to La. C.E. art. 404(B). At trial, five of the other victims[2] testified about the defendant taking their automobiles. The defendant argues that the small probative value of this evidence was far outweighed by the danger of unfair prejudice.
La. C.E. art. 404 provides, in pertinent part:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of |inany such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
A trial court’s ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. State v. Blackwell, 30,281 (La.App.2d Cir.11/10/97), 701 So.2d 1389, writ denied, 1997-3073 (La.2/13/98), 709 So.2d 755.
For evidence of other crimes to be admissible, the state must prove with clear and convincing evidence: (1) that the other *942 acts or crimes occurred and were committed by the defendant, (2) that the other acts satisfy one of the requirements of La. C.E. art. 404(B)(1) [motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident], and (3) that the probative value of the evidence outweighs its prejudicial effect. State v. Jackson, 625 So.2d 146 (La.1993); State v. White, 36,935 (La.App.2d Cir.6/6/03), 850 So.2d 751; State v. Blackwell, supra.
Evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that forms an integral part of the act or transaction that is the subject of the present proceedings. La. C.E. art. 404(B)(1); State v. Jackson, supra; State v. White, supra.
In the present case, the “other crimes” evidence allowed the state to show that the defendant had a pattern of taking and not returning vehicles entrusted into his care, showing his intent in the present case, his knowledge that his actions were unauthorized, and the lack of any mistake or accident. In It cannot be said that the trial court’s decision to allow this evidence was an abuse of its discretion.
This assignment is without merit.
EXCESSIVE SENTENCE
In this assignment of error, the defendant argues that the recent ameliorative changes in the habitual offender law should be considered and that the life sentence imposed upon him as a fourth felony offender shocks the conscience.
La. R.S. 15:529.1(A)(l)(c)(ii), as in effect at the time of the offenses in 2000, provided:
(c) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
(ii) If the fourth or subsequent felony or any of the prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or of any other crime punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence. [Emphasis added.]
Under the provisions of La. R.S. 14:2(13), both aggravated criminal damage to property, the defendant’s present conviction, and attempted sexual battery, one of his prior convictions, fall within the definition of “crime of violence.”
In 2001, the legislature amended La. R.S. 15:529.1(A)(c)(ii) to require a life sentence for a defendant adjudicated a fourth felony offender “[i]f the fourth felony and two of the prior felonies” were crimes of violence, specified sex offenses against a victim under age 18, or certain 112offenses punishable by specified terms of imprisonment, or any combination of such crimes. However, the Louisiana Supreme Court recently held that the changes in the habitual offender law mandated by Acts 2001, No. 403 do not apply to sentences imposed for crimes committed before the effective date of the act. State v. Barnes, 2002-2059 (La.4/4/03), 845 So.2d 354.
The defendant contends that the trial court should have considered the recent changes in the law regarding life sentences for habitual offenders. Here, the defendant was adjudicated a fourth felony offender, and La. R.S. 15:529.1, as in effect at the time of the offense, mandated a life sentence without benefits for him. The defendant notes that under the recent amendments to the habitual offender law, he would not have been subject to the mandatory life sentence. However, the *943 defendant also acknowledges that the Barnes case requires the trial court to apply the habitual offender law as it was written at the time of the offense.
The defendant also asserts that the trial court should have considered the factors in Dorthey, supra, and determined whether his mandatory minimum sentence was constitutionally excessive because it made no “measurable contribution to acceptable goals of punishment” or amounted to nothing more than “the purposeful imposition of pain and suffering” and was “grossly out of proportion to the severity of the crime.”
The mandatory life sentence imposed by the habitual offender statute is presumptively constitutional and should be accorded great deference by the judiciary. State v. Johnson, 1997-1906 (La.3/4/98), 709 So.2d 672; State v. Wade, 36,295 (La.App.2d Cir.10/23/02), 832 So.2d 977, writ denied, 2002-2875 (La.4/4/03), 840 So.2d 1213. Although courts have the power to declare a mandatory sentence excessive under Article I, § 20 of the Louisiana Constitution, this power should only be exercised in rare cases and only when the court finds there is clear and convincing evidence that would rebut the presumption of constitutionality. Johnson, supra; Wade, supra; State v. Thomas, 36,998 (La.App.2d Cir.4/9/03), 842 So.2d 1206; State v. Surry, 37,448 (La.App.2d Cir.9/24/03), 855 So.2d 893.
The burden is on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional. Johnson, supra; Wade, supra. To do so, the defendant must clearly and convincingly show that he is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Johnson, supra.
In the instant case, the trial court considered all the circumstances and mitigating factors and properly found no unusual circumstance justifying a downward departure from the imposed mandatory life sentence. Although the defendant’s action in not returning a vehicle timely is, in itself, a nonviolent crime, the subsequent flight from the police in a high speed and dangerous chase put numerous lives at risk both on the highway and in several residential neighborhoods. At one point, the defendant attempted to run over a police officer who was trying to stop him. Furthermore, the defendant has a lengthy criminal history which includes numerous arrests 114for unauthorized use of a movable and several sexual offenses involving teenage boys. He received probation for a 1985 conviction for crime against nature, which was revoked following his 1987 guilty plea to indecent behavior with a juvenile. In 1991, he was charged with sexual battery of a 15-year-old boy; he pled guilty to attempted sexual battery.
The 43-year-old defendant failed to carry his burden of proof under Johnson, supra, because he has not shown any unusual circumstance that would support such a rare downward departure. The goals of the habitual offender statute, to deter and punish recidivism, are satisfied by imposing a life sentence against a person such as this defendant. State v. Lindsey, 1999-3302 (La.10/17/00), 770 So.2d 339, cert. denied, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).
This assignment is without merit.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. The other officer had not been subpoenaed in the case and was unavailable to testify.

. Brad Rupe testified at the Prieur hearing, but did not testify at trial.